Date signed August 02, 2010



IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
at GREENBELT

| | | | |
|---|---|---|---|
| In Re: | * | | |
| **Donald L. Vetal, Jr.** | * | Case No. | 09-20054-TJC |
| | * | Chapter | 7 |
| **Debtor** | * | | |
| ****************************************** | * | | |
| **Dragan Petrovic** | * | | |
| | * | | |
| **Plaintiff** | * | Adv. No. | 09-639 |
| vs. | * | | |
| **Donald L. Vetal, Jr.** | * | | |
| | * | | |
| **Defendant** | * | | |

**MEMORANDUM OF DECISION**

Before the Court is the motion for summary judgment filed by Donald L. Vetal, Jr. ("Defendant") on June 2, 2010 (Docket No. 29). The motion is opposed by Plaintiff Dragan Petrovic ("Plaintiff"). Defendant seeks summary judgment on Plaintiff's complaint requesting that a debt from Defendant should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A). The Court held a hearing on the motion on July 22,

1

2010.  For the reasons set forth below, the Court will grant summary judgment in favor of Defendant.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## MATERIAL FACTS NOT IN DISPUTE

Defendant joined Century Pools Management, Inc. ("Old Century Pools") in October 2004.  He was hired as the chief financial officer and promoted to president in 2006.  In December 2006, Defendant organized Century Pools, which purchased Old Century Pools for $2.1 million.  Eagle Bank (the "Bank") loaned Century Pools a term loan for $500,000 and a revolving line of credit of $1,200,000 that were secured by Century Pools's accounts receivable, inventory, equipment and intangibles.

In 2008, Century Pools began to experience financial difficulties.  On or about August 22, 2008, it issued 1400 payroll checks for the pay period ending August 15, 2008.  Of those checks, 150 were not honored due to insufficient funds.  Century Pools withheld making the next payroll on September 5, 2008.  On September 8, 2008, the Bank froze Century Pools's line of credit and stopped honoring its checks.  Century Pools closed immediately thereafter.

Plaintiff was not paid for his services since on or about August 15, 2008 until Century Pools ceased operations on or about September 8, 2008.

Plaintiff brought this action as a class action, although he did not seek class certification until after the close of discovery and after Defendant filed his motion for summary judgment.  The class certification motion is pending.

## CONCLUSIONS OF LAW

The applicable standards governing a motion for summary judgment are well established.

> In bankruptcy, summary judgment is governed in the first instance by Federal Rule of Bankruptcy Procedure 7056, which expressly incorporates into bankruptcy proceedings the standards of Federal Rule of Civil Procedure 56. A court may award summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *In re Apex Express Corp.,* 190 F.3d 624, 633 (4th Cir.1999); *see also* Fed. R. Civ. Proc. 56(c) (providing that award of summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"). In evaluating a summary judgment motion, a court "must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *Apex Express Corp.,* 190 F.3d at 633. In so doing, a court is not entitled to either weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."). If the moving party is unable to demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Honor v. Booz-Allen & Hamilton, Inc.,* 383 F.3d 180, 185 (4th Cir.2004).

*In re French*, 499 F.3d 345, 351-352 (4th Cir. 2007).

Further,

> A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied, Gold*

> *v. Panalpina, Inc.,* 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted).

*Kress v. Food Employers Labor Relations Ass'n*, 285 F.Supp. 2d 678, 682 (D.Md. 2003).

"The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an honest but unfortunate debtor." *Cohen v. De La Cruz,* 523 U.S. 213, 217 (1998). This policy is codified in Section 523, which provides in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
> \* \* \*
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A). While exceptions to discharge are narrowly interpreted to protect the purpose of providing debtors a fresh start, it is equally important to ensure that "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Foley & Lardner v. Biondo (In re Biondo),* 180 F.3d 126, 130 (4th Cir. 1999).

To prevail on a claim that a debt should be excepted from discharge, a creditor must prove all the elements of Section 523(a)(2) by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991). Specifically, a creditor must "prove four elements: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation." *Biondo*, 180 F.3d at 134**;** *Miller v. Cigna Ins. Co.*, 311 B.R. 57,

4

61 (D. Md. 2004); *see also*, *Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 149 (Bankr. D. Md. 1999) (finding that in order to sustain an action under Section 523(a)(2)(A), the plaintiffs must prove: (1) that the debtor made a representation; (2) that at the time the debtor knew the representation was false; (3) that the debtor made the representation with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representation; and (5) that the creditor sustained loss and damage as the proximate result of the representation.); *accord, Guaranty Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 371-372 (Bankr. D. Md. 2005).

On the record before the Court, no reasonable fact-finder could find that Defendant made a representation that he knew was false, or that he did so with the purpose and intention of deceiving Plaintiff.[1]

Plaintiff's complaint contains very little in the way of factual allegations that could establish a claim under 11 U.S.C. 523(a)(2)(A). The gist of Plaintiff's claim is as follows:

> [The Defendant's acts] were intentional and knowing. Defendant withheld wages while accepting the benefits of Plaintiffs' labor. By his course of dealing, Defendant knew that Plaintiff and other similarly situated employees continued to work in exchange for payment of agreed upon wages.

Complaint at ¶ 8. Thus, at the very least, Plaintiff would have to establish at trial that Defendant induced Plaintiff to continue to work knowing that Plaintiff would not be paid.[2]

---

[1] Because the Court concludes that Plaintiff cannot make this showing it will not address the other elements of a § 523(a)(2)(A) action or Defendant's other contentions.

[2] Plaintiff made it clear in the Complaint, ¶ 8, the opposition brief (Docket No. 33 at 6, "…debtor knew that it was impossible that [the] workers would be compensated"), and at the hearing, that the standard Plaintiff seeks to impose is that the Defendant knew the Century Pools could not meet payroll, as opposed

5

In support of the motion, Defendant submits an affidavit that explains the events leading to the failure to pay employees and the closing of Century Pools. Vetal Aff., Docket No. 30-1. Defendant's explanation of these events is as follows:

Century Pools, like its predecessor Old Century Pools recruited much of its workforce from Eastern Europe. Vetal Aff. at ¶ 5. Many of these employees returned each year and eventually assumed middle management roles in the company. *Id.* By 2007, these international seasonal hires represented 70% of Century Pools's workforce. *Id.*

By the beginning of the 2008 pool season, however, Congress reduced the number of allotments available for the Seasonal Workers H2B Visa Program, the program, which enabled these workers to work for Century Pools. *Id.* at ¶ 6. As a result, Century Pools lost approximately 500 of its experienced, seasonal employees. *Id.* This caused customer service to suffer, and resulted in Century Pools providing approximately $300,000 in service credits to customers in late July and early August 2008. *Id.* Defendant states that the service credits "ameliorated any customer dissatisfaction, ensuring that the remaining client fee installments would be paid through the remainder of the season (one of two major sources of revenue for Century Pools)." *Id.*

Century Pools's second major source of revenue was generated from maintenance service provided to pool customers, generally in September and October after the pools closed for the season. *Id.* at ¶ 7. In December 2007, Congress enacted the Virginia Graeme Baker Pool and Spa Safety Act. *Id.* This Act imposed new safety standards on public pools. *Id.* Century Pools estimated that the average cost to comply with the Act

---

to, for examples, that Defendant should have known or had reason to believe that employees would not be paid.

was between $1000 and $5000 per pool and that this work would generate an additional $1 million in revenue in the Fall 2008. *Id.*

Defendant had discussions with two companies about potentially acquiring Century Pools. *Id.* at ¶¶ 9, 13. On or about July 22, 2008, he requested an increase on the Bank's line of credit from $1.2 million to $1.65 million. *Id.* at ¶ 10. On or about August 28, 2008, the Bank notified Defendant that it rejected the requested increase. *Id.* at ¶ 11.

During August, 2008, the rate of collections on Century Pools's receivables began to drop significantly. *Id.* at ¶ 8. On August 22, 2008, Century Pools issued paychecks to its hourly employees for the pay period ending August 15, 2008. *Id.* at ¶ 14. At that time, Century Pools's account receivable balance exceeded $1.5 million. *Id.* Century Pools anticipated substantial receivable collections over the weekend of August 23-24, which was an historically high collection period. *Id.* However, accounts receivable collections were significantly lower than expected, and approximately 150 of 1400 checks were returned for insufficient funds. *Id.* at ¶ 15. Defendant believed the drop in receivable collections was temporary. *Id.* at ¶ 18.

Century Pools increased its efforts to collect receivables, but collections remained slow during the remainder of August and into September 2008. *Id.* at ¶ 17. As of August 31, 2008, Century Pools's accounts receivable balance was $1,554,558. *Id.* at ¶ 12. The decision was made to defer the August 16 - 29 payroll, which was due to be paid on September 5, 2008. *Id.* The decision to postpone payroll had an immediate adverse consequence on the company, which further hindered collecting receivables. *Id.* at ¶ 19. On September 8, 2008, the Bank stopped honoring checks and froze the line of credit. Century Pools ceased doing business immediately thereafter. *Id.* at ¶¶ 20, 21.

The foregoing explanation by Defendant in his affidavit leads the Court to conclude that, in the absence of evidence to the contrary, no reasonable fact-finder could find that the Defendant knew the employees would not be paid until September 8, 2008, when the Bank froze the line of credit and stopped honoring checks.  Although Century Pools was experiencing some financial difficulties in the summer of 2008, there is no evidence in the record that Century Pools had any difficulty meeting payroll before the payroll due for the period August 1 - 15, 2008.  That payroll was scheduled to be paid on August 22, 2008.  Century Pools issued 1400 checks, of which 150 were returned for insufficient funds.  Century Pools then immediately reissued those checks and the payroll was paid in full by August 29, 2008.  It had difficulty meeting that payroll because accounts receivable collections were less than anticipated.

The next payroll period was for the period August 16 through August 29, 2008, which was payable September 5, 2008.  The Bank did not reject Century Pools request for an increase on its line of credit until August 28, 2008.  Certainly before the rejection, it could not be said that Defendant knew Century Pools could not meet payroll.  And Century Pools's account receivable balance as of August 31, 2008 exceeded $1.5 million.  Century Pools increased its efforts to collect outstanding receivables, but despite those efforts, receivable collections remained slow during the end of August and into early September 2008.  Defendant stated he believed the drop in accounts receivable was temporary and nothing contradicts that statement.  Century Pools's decision to hold off issuing the September 5th payroll checks set in motion events leading to the Bank's action on September 8.  Once the Bank froze the line of credit and stopped honoring checks, Century Pools closed immediately.

As stated above, the Vetal Aff. shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247. In the absence of evidence to the contrary, summary judgment in favor of Defendant would be warranted. The sole evidence Plaintiff submits to dispute Defendant's affidavit are portions of Defendant's deposition and a document labeled "Century Pools Management Projection 2008" (the Cash Flow Projection"). *See* Docket No. 33, p. 37.

The excerpts from Defendant's deposition submitted by Plaintiff generally address background information and in any event do not contradict his affidavit in any material respect. With respect to the payroll due for September 5, Defendant states:

> Q. What is your best recollection on what occurred on the last payroll run?
>
> A. On the last payroll run, we were again looking for Receivables payments, which I think, at that point, we had about a million-five [of accounts receivables] outstanding, and were expecting the payments to come in during the two-week period, and there just was insufficient collections at that point, and I made the decision not to run the payroll at that point to avoid the NSF charges and to avoid employees taking the checks to the banks.

Vetal Dep. (May 6, 2010) 29:9-19.

Defendant's testimony affirms that the end of August, early September, 2008, period was historically a time of high receivable collections:

> Q. You also mentioned that some of the HOAs didn't have funds to pay. Was the collection time – was there some point in the year when the days taken to collect Receivables began to expand and took longer to receive payments from clients?
>
> A. Not typically, because clients would typically be pressured to make their accounts current before the last day, that Labor Day period. Clients were pretty sensitive to keep the pools open and operating that last

9

> weekend, that last holiday weekend, so there was a big impetus for them to pay before that.

*Id.* at 49:10-21.

Defendant also affirms that the he first knew that Century Pools could not meet payroll when the Bank froze the line of credit and stopped honoring checks:

> A.   I pretty much knew when the bank pulled the line in September. I believe it was somewhere around September 8th, about that time, when the bank contacted or stopped honoring our checks and was withholding funds and not advancing on the L.L.C.[sic], that that was the point we were not going to be able to make the payroll.
>
> Q.   Did you have any indication before that?
>
> A.   No.

*Id.* at 49:1-9.

Thus, Defendant's deposition provides no support for Plaintiff's claims. There are no credibility issues that prevent summary judgment—Defendant's affidavit and his deposition testimony are consistent. There are no competing affidavits for the Court to consider.

This leaves only the Cash Flow Projection as potentially creating a dispute over a material fact for the fact-finder to resolve. But, for the reasons set forth below, if anything the Cash Flow Projection supports Defendant's version of events rather than supporting Plaintiff's claim that Defendant knew the employees would not be paid for their services.

 Defendant addressed the Cash Flow Projection to a limited extent in his deposition. The purpose of the Cash Flow Projection was "to look at the financial status of the company and make adjustments as needed to the operation in order to meet financial targets." *Id.* at 54:23-55:2. The Cash Flow Projection included actual results of

10

operations through July 2008 and projections for August to the end of the year. *Id.* at 55:6-11. It was prepared sometime around the end of July, 2008. *Id.* at 55:12-13. Defendant received financial statements such as the Cash Flow Projection on a fairly regular basis. *Id.*

Other than the foregoing basic, primarily foundational information concerning the Cash Flow Projection, Plaintiff did not ask any other questions about it at the Defendant's deposition. Thus, the Court is left to determine whether a reasonable fact-finder could conclude that Defendant knew employees would not be paid from the face of the document alone.

The analysis begins, and perhaps ends, with the recognition that the Cash Flow Projection shows that Century Pools would be cash flow positive as of the end of 2008. The face of the document shows that, for the period August through December 2008, Century Pools could meet its obligations and have surplus cash as of year-end. Thus, Defendant may have been concerned about Century Pools's ability to meet payroll, and it may have been the case that some obligations would be paid later than when due, but the document does not support the contention that Defendant *knew* Century Pools could not pay employees.

The Cash Flow Projection also shows that Century Pools's beginning accounts receivable balance on August 1, 2008 was $2,123,864, and it anticipated adding $796,042 in receivables during August. This is in contrast to total payroll for August and September of $2,768,890. Thus it supports, rather than contradicts, Defendant's statements that Century Pools had adequate accounts receivable to pay payroll if

11

collections were realized as in previous years, and it was the decline in the rate of collections, coupled with the Bank's actions, that led to the inability to pay employees.

To be sure, the Cash Flow Projection shows that Century Pools would begin August 2008 with a negative $262,000 cash position, and that deficit would grow to negative $818,540 by month end. But it also shows that, taking into account "Month End Float", the cash position improves from negative $262,000 to negative $168,640 by month end. Thus, based on this document alone, a fact-finder could not reasonably conclude that Defendant knew Century Pools could not pay employees in September 2008.

Finally, summary judgment in favor of Defendant is appropriate also because of Plaintiff's failure to submit evidence that could establish justifiable reliance. In *Field v. Mans*, 516 U.S. 59 (1995), the United States Supreme Court stated that a plaintiff must show justifiable reliance rather than reasonable reliance to prevail under Section 523(a)(2)(A). Justifiable reliance does not mean that the plaintiff's "conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 71 (quoting Restatement (Second) of Torts (1976) § 545A, Comment b). "[A] person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation." *Id.* at 70 (internal quotation marks omitted). "[T]he plaintiff is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation cannot

offer as a defense the plaintiff's failure to make the investigation or examination to verify the same." *Id.* at 72 (quoting 1 F. Harper & F. James, Law of Torts § 7.12, pp. 581-583 (1956)). Nonetheless, a plaintiff is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Mans*, 516 U.S. at 71 (quoting Restatement (second) of Torts (1976) § 541, comment a)

Plaintiff failed to address the element of justifiable reliance with respect to the summary judgment motion. In seeking class certification, however, Plaintiff cites to several securities fraud cases and states that, in material omission case, as opposed to actual misrepresentation cases, there is a "presumption of reliance." *See* Supplemental Briefing on Issued Raised in July 22nd Hearing (Docket No. 44), p.3. Plaintiff states "all that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making this decision." *Id.* citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972). But whatever the rule may be in the context of a case in which reasonable reliance is at issue—and therefore where the determination is made on the basis of a reasonable person standard— there is no doubt that the standard in a § 523(a)(2)(A) case is justifiable reliance, and the inquiry is on "the qualities and the characteristics of the particular plaintiff and the circumstances of the particular case . . . ." *Field v. Mans*, 516 U.S. at 71.[3]

---

[3] Even in the context of class certification in reasonable reliance cases, the Court has doubts as to the scope of the presumption of reliance in nondisclosure cases, at least in the Fourth Circuit. The Court of Appeals for the Fourth Circuit emphasized the critical importance of the reliance element in a fraud and misrepresentation case. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F. 3d 331, 341-342 (4th Cir. 1998) (denying class certification on fraud and misrepresentation claims in a case alleging failure to disclose the amount of commission taken from an account because "reliance must be applied with factual precision."). The Court specifically noted that "if a plaintiff had an alternative source for the *information that is alleged to have been concealed* from or misrepresented to him, his *ignorance* or reliance on any misinformation is not reasonable." *Id*. at 341 (emphasis added).

13

Here, the record contains nothing concerning Plaintiff's justifiable reliance—no deposition transcript, no affidavit, etc.

> [A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.

*Kress,* 285 F.Supp. 2d. at 682.  As the nonmoving party, it was incumbent on Plaintiff to submit evidentiary support that could create an issue of fact that Plaintiff justifiably relied on Defendant's alleged nondisclosure.  This, Plaintiff failed to do.  Accordingly, summary judgment in favor of Defendant is appropriate.

## CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment.

Copies to:

Plaintiff
Plaintiff's Counsel
Defendant
Defendant's Counsel
Chapter 7 Trustee
Office of the U.S. Trustee


**End of Memorandum**